IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CAROL WAYNE FRAZIER AND TONYA | * | |
| R. FRAZIER, INDIVIDUALLY AND AS | * | |
| REPRESENTATIVE OF THE ESTATE OF | * | |
| LAUREN M. FRAZIER, DECEASED, | * | |
| Plaintiffs | * | |
| | * | |
| V. | * | C. A. NO. 2-05-CV-548-LED |
| | * | |
| HONEYWELL INTERNATIONAL, INC., | * | (JURY DEMAND) |
| F/K/A ALLIED-SIGNAL, INC. | * | |
| Defendant. | * | |

## HONEYWELL INTERNATIONAL, INC.'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, OR ALTERNATIVELY MOTION FOR NEW TRIAL AND FOR REMITTITUR

TO THE HONORABLE JUDGE:

### STATEMENT OF FACTS

Lauren Frazier was killed when the vehicle in which she was a passenger was struck by a drunk driver and she was ejected. Plaintiffs assert that she was ejected because her seat belt allegedly "inertially unlatched." Defendant denied Lauren was belted at the time of the accident and denied the existence of any design defects in the seat belt assembly. A jury found for Plaintiffs and awarded damages totaling $24,000,000.00. Honeywell is entitled to a judgment notwithstanding the verdict, or alternatively is entitled to a new trial or a remittitur on the grounds set forth herein as follows:

**I.** **PLAINTIFFS FAILED TO PROVE SPECIFIC CAUSATION. JUDGMENT NOTWITHSTANDING THE VERDICT MUST BE ENTERED IN FAVOR OF HONEYWELL INTERNATIONAL, INC.**

Proof of causation is an essential element of every product liability action. In design defect cases, a claimant must prove that the alleged defect "was a _producing cause_ of the personal injury, property damage, or death for which the claimant seeks recovery." (Emphasis

added.) TEX. CIV. PRAC. & REM. CODE ANN. § 82.005.  "A producing cause is 'an efficient, exciting, or contributing cause, which, in a natural sequence, produced injuries or damages complained of, if any.'"  *General Motors Corp. v. Harper*, 61 S.W.3d 118, 130 (Tex. App.- Eastland 2001, no pet.).

To prove an alleged design defect was a producing cause of an injury, the claimant *must* establish two things: (1) that a particular aspect of a product was capable of causing harm (i.e., "general causation"); *and* (2) that the product actually caused the injury (i.e., "specific causation").  *See id.* at 130-31.  It is not enough to point to a theoretical defect; the claimant also must demonstrate that the alleged defect was a "cause in fact" of the injury, "which means that the defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct."  *Id.* at 130-31.  Under Texas law, "[c]ausation cannot be established by mere guess or conjecture" nor may "[a] party establish a vital fact by piling one inference upon another."  *Rayon v. Energy Specialties, Inc.*, 121 S.W.3d 7, 16 (Tex. App.-Ft. Worth 2002, no pet.).

Here, to show that the JDC buckle was a "producing cause" of the decedent's death, Plaintiffs had to show not only that the JDC buckle was capable of opening due to inertia, but also that the actual circumstances of *this* accident (as opposed to some hypothetical event) were capable of causing that buckle to open.  This they failed to do.  Just as in a drug or chemical exposure case -- where a plaintiff must show that the "dose" and "duration" of exposure were sufficient to cause a specific disease -- these plaintiffs had to show that the *level of acceleration (G's)* encountered in this wreck was great enough (i.e., "the dose") and lasted long enough (i.e., "the duration") to cause a JDC buckle to open spontaneously.  Although Plaintiffs' expert opined that the acceleration in this accident was 20 G's, Plaintiffs presented no evidence at all about the

level of G's or the pulse duration that would cause a JDC buckle to open spontaneously. On the contrary, the Defendant's evidence established – without contradiction – that the _minimum_ threshold acceleration at which a JDC buckle will open is 177 G's, a level nearly _nine hundred_ _percent higher_ than the conditions that existed during the Fraziers' accident. Plaintiffs utterly failed to demonstrate "specific causation" and Honeywell is entitled to judgment as a matter of law.

Indeed, Plaintiffs' expert effectively admitted that the physical forces necessary to open a JDC buckle _never_ existed during this accident.    His opinion that the buckle "opened spontaneously" is revealed to be nothing more than inadmissible speculation and conjecture. _Harper,_ 61 S.W.3d at 130 n.7 (finding similar conclusory testimony by Syson constituted mere speculation and "no evidence."). Because Plaintiffs failed to prove that the alleged design defect was a "producing cause" of Lauren Frazier's death, Honeywell is entitled to judgment notwithstanding the verdict.

## II.    PLAINTIFFS ALSO FAILED TO REBUT THE PRESUMPTION UNDER TEXAS LAW THAT A SEATBELT IS NON-DEFECTIVE WHEN IT COMPLIES WITH FEDERAL REGULATIONS. AN UN-REBUTTED PRESUMPTION OVERCOMES A CONTRARY VERDICT. HONEYWELL IS ENTITLED TO JUDGMENT NOTWITHSTANDING THAT ERRONEOUS VERDICT.

Honeywell is entitled to judgment notwithstanding the verdict because Plaintiffs failed to rebut the presumption of non-liability that arises under Texas law when a product complies with federal safety standards. Tex. Civ. Prac. & Rem. Code § 82.008(a), _eliminates_ liability if a product meets federally-mandated safety standards. The statute provides:

> (a) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller _is not_ _liable for any injury to a claimant_ caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the

3

time of manufacture and that governed the product risk that allegedly caused harm.

The statute allows the presumption of "non-liability" to be rebutted in _only_ two limited circumstances. Tex. Civ. Prac. & Rem. Code § 82.008(b).[1] The first is to establish that the federal standard itself is "inadequate to protect the public from unreasonable risks of injury or damage." *Id.* The only other way is to show that the manufacturer intentionally "withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action." *Id.* These are the _only_ means by which the presumption of non-liability can be overcome and Plaintiffs introduced no evidence at all on either point. They provided no evidence undermining the regulations themselves, nor did they even suggest that the United States Government inadequately protected its citizens by creating the regulations. Plaintiffs failed to provide any evidence, or even suggest, that Honeywell ". . . withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action."

It was undisputed at trial that the seatbelt assembly, including the buckle, complied with Federal Motor Vehicle Safety Standards. Plaintiffs even stipulated to that fact. Thus, a presumption of *no liability as a matter of law* stands utterly un-rebutted in this case and the statute requires that judgment be entered in Honeywell's favor. An un-rebutted presumption automatically establishes the fact in question. *Rehm v. United States*, 183 F. Supp. 157, 160

---

[1] Tex. Civ. Prac. & Rem. Code § 82.008(a) provides only two ways in which to rebut the presumption of non-liability in the case of a federally regulated product such as a seatbelt:

    (b) The claimant may rebut the presumption in Subsection (a) by establishing that:
        (1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or
        (2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action.

(E.D.N.Y. 1960) ("When a true presumption arises, the defendant must come forward and rebut the presumption or suffer a directed verdict."); *United States v. $1,963 in United States Money*, 270 F. Supp. 396, 401 (E.D. Tenn. 1967) (quoting *Lamb v. Sutton*, 164 F. Supp. 928, 934 (E.D. Tenn. 1958)) (". . . a presumption ordinarily prevails, in the absence of proof to the contrary."); *Hall v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor*, 1995 WL 3679 at *2 (4th Cir.1995) (noting that an unrebutted presumption under the C.F.R. established a conclusive fact). But here, because the un-rebutted presumption is not merely a fact, but rather a legal conclusion ("that the product manufacturer or seller is not liable for any injury to a claimant"), it overcomes the contrary jury verdict and Honeywell is entitled to judgment notwithstanding that verdict. See Tex. Civ. Prac. & Rem. Code § 82.008(a) (App.33).

III.   **BECAUSE PLAINTIFFS' EXPERT CONCEDED THAT HIS THEORETICAL "INERTIAL RELEASE" WAS CAUSED BY THE LENGTH OF THE BUCKLE'S MOUNTING STALK, A COMPONENT SPECIFIED BY GENERAL MOTORS, HONEYWELL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

Plaintiff was confronted with a real dilemma in this case. The two front seat occupants were belted, were using identically designed buckles and walked away from the wreck unharmed. Plaintiff had to find some "difference" between the front and rear belts that might account for the result experienced by the rear occupants – other than the fact they were not using their seatbelts. Plaintiff's expert seized upon the different length of "mounting stalks" for the front belts as compared to the rear belts. However, the expert readily admitted that the anchor points and methods of attaching the buckles to the vehicle were determined, not by the supplier, Honeywell, but rather by the vehicle manufacture, General Motors Corporation.

Because it was undisputed that the manner and method of attaching the buckles to the vehicle at each seating position was chosen by General Motors – not Honeywell – the expert's result-oriented distinction amounted to an admission by him that the "but for" cause of Lauren

Frazier's ejection, taking all inferences in favor of the Plaintiffs, was the different length of the buckle mounting stalks in the rear seating positions. In short, the inducing mechanism was not the internal mechanism of the JDC buckles (since they are all identical), but rather the "external" factor of "mounting stalk length," for which Honeywell was not responsible and as a component part supplier, cannot be held liable. Under Texas law, a plaintiff must show that the defendant's conduct was a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct. *General Motors Corporation v. Saenz,* 873 S.W.2d 353, 357 (Tex. 1993). As part of their *prima facie* case, Plaintiffs had to prove that an alleged "defect" in Honeywell's buckle was a cause of the decedent's death. See, RESTATEMENT (THIRD) OF TORTS §§ 1, 15, 16 (1998); *Harper,* 61 S.W.3d at 130 -131. Plaintiffs failed to meet their burden on that issue, showing instead that the "producing cause" of the event was the length of the GM-specified mounting stalk. Accordingly, Honeywell is entitled to judgment notwithstanding the verdict. See e.g., *Davis v. Dresser Industries, Inc.,* 800 S.W.2d 369, 371 (Tex. App.-Eastland 1990, writ denied) (noting that under Texas law, where the alleged injury causing mechanism results from the manner of final assembly, a component part supplier cannot be liable).

## IV.   HONEYWELL ALSO HAS NO LIABILITY UNDER THE COMPONENT PART SUPPLIER DEFENSE

Honeywell is entitled to judgment notwithstanding the verdict for substantially the same reasons pursuant the Component Part Supplier Doctrine. Following the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 5, component manufacturers are not liable unless they "substantially participate in the integration of the component" into the finished product. See also, RESTATEMENT (SECOND) OF TORTS, §404, Comment (a); 63A AM JUR 2D PRODUCTS LIABILITY §§ 1513-1517 ("a manufacturer cannot be held liable for producing a product with

specifications that are beyond its control"). As explained by the Sixth Circuit in *Garrison v. Rohm & Hass Co.*, 492 F.2d 346, 351 (6th Cir. 1974) "to hold [the component part manufacturer] liable for defective design would amount to holding a non-designer liable for design defect. Logic forbids any such result." See also PROSSER, LAW OF TORTS (4TH ED), § 104, p. 681 (". . . the contractor is not liable if he has merely carried out carefully the plans, specifications and directions given him, since in that case the responsibility is assumed by the [purchaser], at least where the plans are not so obviously defective and dangerous that no reasonable man would follow them."). See also, *Leininger v. Stearns-Roger Manufacturing Co*, 17 Utah 2d 37; 404 P2d 33 (1965); *McCabe Powers Body Co v. Sharp*, 594 S.W. 2d 592 (Ky. 1980); *Moon v. Winger Boss Co, Inc.*, 205 Neb 292; 287 N.W. 2d 430 (1980); *Hunt v. Blasius*, 55 Ill. App. 3d 14; 370 N.E. 2d 617 (1977).

This limitation on the duty of a component part supplier is well-recognized throughout American Jurisprudence. Universally, courts are protective of component part suppliers. See e.g., *Crossfield v. Quality Control Equip. Co., Inc.*, 1 F.3d 701 (8th Cir.1993) (applying Missouri law) ("To impose responsibility on the supplier in the context of the larger defectively designed machine system would simply extend liability too far."). [2] These courts hold that component

---

[2] *In Re: TMJ Implants Products Liability Litigation*, 872 F. Supp. 1019 (D.Minn.1995), aff'd, 97 F.3d 1050 (8th Cir.1996) (applying Minnesota law); *Kealoha v. E .I. Du Pont de Nemours & Co.*, 844 F. Supp. 590 (D. Hawaii 1994), aff'd, *Kealoha v. E.I. Du Pont de Nemours & Co., et al.*, 82 F.3d 894 (9th Cir.1996) (applying Hawaii law); *Jacobs v. E.I. Du Pont de Nemours & Co.*, 67 F.3d 1219 (6th Cir.1995) (applying Ohio law); *Apperson v. E.I. Du Pont de Nemours & Co.*, 41 F.3d 1103 (7th Cir .1994) (applying Illinois law); *Childress v. Gresen Mfg. Co.*, 888 F.2d 45 (6th Cir.1989) (applying Michigan law); *In Re: Silicone Gel Breast Implants Products*, 996 F. Supp. 1110 (N.D.Ala.1997); *Travelers Ins. Co. v. Chrysler Corp.*, 845 F. Supp. 1122 (M.D.N.C.1994); *Sperry v. Bauermeister*, 786 F. Supp. 1512 (E.D.Mo.1992); *Estate of Carey v. Hy-Temp Mfg., Inc.*, 702 F. Supp. 666 (N.D.Ill.1988); *Orion Ins. Co., Ltd. v. United Tech. Corp.*, 502 F. Supp. 173 (E.D.Pa.1980); *Mayberry v. Akron Rubber Machinery Corp.*, 483 F. Supp. 407 (N.D.Okla.1979); *Artiglio v. General Electric Co.*, 61 Cal.App.4th 830, 71 Cal.Rptr.2d 817 (1998); *Bond v. E.I. Du Pont de Nemours & Co.*, 868 P.2d 1114 (Colo.Ct.App.1993); *Shaw v. General Motors Corp.*, 727 P.2d 387 (Colo.Ct.App.1986); *Castaldo v. Pittsburgh-Des Moines Steel Co., Inc.*, 376 A.2d 88 (Del.1977); *Depre v. Power Climber, Inc.*, 263 Ill.App.3d 116, 200 Ill. Dec. 203, 635 N.E.2d 542 (1994); *Curry v. Louis Allis Co., Inc.*, 100 Ill.App.3d 910, 56 Ill. Dec. 174, 427 N.E.2d 254 (1981); *Murray v. Goodrich Eng'g Corp.*, 30 Mass. App. 918, 566 N.E.2d 631 (1991); *Welsh v. Bowling Electric Machinery, Inc.*, 875 S.W.2d 569 (Mo.Ct.App.1994); *Zaza v. Marquess & Nell, Inc.*, 144 N.J. 34, 675 A.2d 620 (1996); *Parker v. E.I. Du Pont*

part suppliers are not liable for non-defective component parts incorporated into other products when they did not substantially participate in the overall design of the more complex finished product. *Id.* The courts also recognize that component part suppliers are not responsible for problems attributable to the specific environment of use rather than to a manufacturing defect in the component part itself. A modern automobile is a complex, integrated whole composed of thousands of components. Manufacturing suppliers who provide those components are not "free agents" capable of dictating how their components shall be integrated into the final vehicle and thus able to protect against every potential end use of their components.[3] See *Crossfield*, 1 F.3d at 704; *Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 49 (6th Cir. 1989) (Refusing to impose such a duty on the component part manufacturer because "extending the duty to make a product safe to the manufacturer of a non-defective component part would be tantamount to charging a component part manufacturer with knowledge that is superior to that of the completed product manufacturer.") As explained by one of the principle drafters of the new Restatement, "[m]anufacturers of component parts are not required to send angels after their component parts to follow them through the purchasing process to see how they are going to be integrated into other products. . ." Twerski, *Products Liability,* 10 Kan. Journal of Law and Pub. Policy 21 (2000).

Texas follows the majority rule by holding that component manufacturers have no

---

*de Nemours & Co., Inc.,* 121 N.M. 120, 909 P.2d 1 (N.M. App.,1995); *Munger v. Heider Mfg. Corp.,* 90 A.D.2d 645, 456 N.Y.S.2d 271 (N.Y.App.Div.1982); *Hoyt v. Vitek, Inc.,* 134 Or. App. 271, 894 P.2d 1225 (1995); *Moor v. Iowa Mfg. Co.,* 320 N.W.2d 927 (S.D.1982); *Davis v. Komatsu American Industries Corp.,* 42 S.W.3d 34 (Tenn. 2001); *Davis v. Dresser Indus., Inc.,* 800 S.W.2d 369 (Tex.App.1990); *Bennett v. Span Indus., Inc.,* 628 S.W.2d 470 (Tex.App.1982); *Westphal v. E.I. Du Pont de Nemours & Co.,* 192 Wis.2d 347, 531 N.W.2d 386 (Wis.Ct.App.1995); *Noonan v. Texaco, Inc.,* 713 P.2d 160 (Wyo.1986).

[3] See e.g., the numerous decisions recognizing that component part suppliers have no control over the ultimate product's design. *Artiglio v. General Electric Co.,* 71 Cal.Rptr.2d 817 (Cal. App. 1998); *Zaza v. Marquess & Nell, Inc.,* 675 A.2d 620, 627 (N.J. 1996); *Depre v. Power Climber, Inc.,* 635 N.E.2d 542, 544 (Ill.App.1994); *Noonan v. Texaco, Inc.,* 713 .2d 160, 164 (Wyo. 1986).

liability for injuries caused by a defect in the end stage product.  The Texas Supreme Court

adopted this doctrine in *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 683 (Tex.

2004), explaining:

> Although this Court has never itself decided the issue, two of the State's courts of
> appeals have held that strict liability for component-part manufacturers is limited
> when the component part is integrated into a larger unit before distribution. *See*
> *Davis v. Dresser Indus., Inc.,* 800 S.W.2d 369, 370-71 (Tex. App.-Eastland 1990,
> writ denied); *Bennett v. Span Indus., Inc.,* 628 S.W.2d 470, 472 (Tex. App.-
> Texarkana 1981, writ ref'd n.r.e.). Numerous courts outside of Texas have held
> likewise. *See Cipollone v. Yale Indus. Prods., Inc.,* 202 F.3d 376, 379 (1st
> Cir.2000); *Port Auth. of N.Y. & N.J. v. Arcadian Corp.,* 189 F.3d 305, 313 (3d
> Cir.1999); *Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 49 (6th Cir.1989); *Zaza v.
> Marquess & Nell, Inc.,* 144 N.J. 34, 675 A.2d 620, 634 (1996); *Buonanno v.
> Colmar Belting Co.,* 733 A.2d 712, 716 (R.I.1999); *Davis v. Komatsu Am. Indus.
> Corp.,* 42 S.W.3d 34, 43 (Tenn.2001). We agree with these courts that if the
> component- part manufacturer does not participate in the integration of the
> component into the finished product, it is not liable for defects in the final product
> if the component itself is not defective. *See* Restatement (Third) of Torts:
> Products Liability § 5 (1998); *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 334
> (5th Cir.1998). *See also* Henderson & Twerski, *The Products Liability
> Restatement in the Courts: an Initial Assessment,* 27 Wm. Mitchell L. Rev. 7, 23
> (2000) ("Section 5 has been enormously influential. It has been cited favorably in
> a host of cases and is likely to put to rest this vexatious issue.").  *It is not proper
> to extend the doctrine of strict liability to the supplier of a component part used in
> a product according to the design of the product's manufacturer when the injuries
> are caused by the design of the product itself, rather than by a defect in the
> component.*

*Bostrom Seating, Inc.*, 140 S.W.3d at 683.  (Emphasis added).

The Plaintiff claimed only that the injury causing mechanism was the length of the GM-

specified mounting stalks rather than Honeywell's buckle.  Stalk length and the means by which

the buckles were attached to the vehicle (factors determined by General Motors), rather than

differences in internal buckle mechanisms were offered as the sole reason why the identical front

seat buckles remained latched while the rear seat buckles supposedly released under load.

Plaintiff's also waived any "manufacturing defect claim."  As a component supplier, Honeywell

merely followed GM's specifications regarding the buckles' mounting, and it was GM that

installed the buckles into the vehicle at one of its assembly plants.  Thus, Honeywell bears no

responsibility as a matter of law for the vehicle manufacturer's choice to utilize shorter stalks in

connection with the rear buckles.  See *Bostrom Seating, Inc.*, 140 S.W.3d at 683.  Honeywell is

entitled to judgment notwithstanding the verdict.

## V.   PLAINTIFFS FAILED TO SHOW THE "MAGNITUDE OF RISK" APPLICABLE EITHER TO THE JDC BUCKLE OR TO THEIR PROPOSED ALTERNATIVE DESIGNS.

Honeywell is likewise entitled to judgment because Plaintiffs failed to establish the

magnitude of risks allegedly associated with either the JDC buckle or any of their proposed

alternative designs.  Without such evidence the jury was left to speculation and conjecture about

the relative merits of either design.

Under Texas law a plaintiff must establish the magnitude of risk associated with an

accused product as part of their *prima facie* case.  Texas Civil Practice & Remedies Code §

82.005 mandates that a balance of risk and utility for the accused product be compared against a

balance of the risk and utility associated with any proposed alternative design.  See Tex. Civ.

Prac. & Rem. Code § 82.005  (Vernon's 2005) (requiring proof not only that a "*safer*" alternative

exists, but also that the alternative design achieves a "*significant*" reduction in the level of risk).

Only by examining the risks and the utilities associated with *both* the accused product and the

risks and utilities associated with the proposed alternative product can a jury rationally determine

whether or not the manufacturer's initial decision to manufactured the accused design was

reasonable under all of the circumstances. [4]   Absent proof bearing upon the severity and

---

[4] This proof requirement finds it basis in one of the most fundamental tenets of American product liability law -- that a manufacturer is not an insurer against accidental injury associated with the use of its product. See e.g., *Shamrock Fuel and Oil Sales Co. v. Tunks*, 416 S.W.2d 779 (Tex.1967); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984).  Nor does the concept of "product liability" require that "every manufacturer incorporate into [its] product every innovation which twenty-twenty hindsight suggests might have rendered the product more safe. . . .Our law demands that products be reasonably fit, not perfectly so." *Hall v. Mississippi Chem. Express, Inc.*, 528 So. 2d 796, 799- 800 (Miss. 1988).  The simple fact that a product can be made more safe does not mean it is defective:

likelihood of harm (i.e., the "magnitude of the risk") associated with both the accused product and its proposed alternatives, as well as proof establishing that the alternative design was available, practical, efficacious and cost-effective, (i.e., the proposed alternative's "feasibility"), the trier of fact cannot reach an informed decision about the relative merits of either design.  To evaluate a manufacturer's *design choice*, proof must be adduced that will allow a trier of fact to weigh the competing risk-utility factors and thereby adequately assess the alternatives.  See Texas Civil Practice & Remedies Code § 82.005.  To establish a design defect claim a plaintiff must prove "(1) that the design renders the product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use, and (2) that a safer alternative design exists which would substantially reduce the risk of injury and be economically and technologically feasible."  *Harper,* 61 S.W.3d at 124; *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex. 1995) (noting that a plaintiff must prove that there is a safer alternative design in order to recover under a design defect theory); *General Motors Corp. v. Sanchez* 997 S.W.2d 584, 588 (Tex. 1999) (An alternative design must substantially reduce the risk of injury *and* be both economically and technologically feasible).

There is no evidence in this record pertaining to the "magnitude of risk" associated with the JDC buckle.  Plaintiffs presented no statistical or empirical data suggesting that the JDC buckle posed any risk at all in real world accidents, much less an "unreasonable risk."  *Every* seatbelt buckle must open [". . . a seat belt assembly shall be provided with a buckle . . . readily accessible to the occupant to permit his easy and rapid removal from the assembly." See,

---

Most any product can be made more safe. Automobiles would be more safe with disc brakes and steel-belted radial tires than with ordinary brakes and ordinary tires but this does not mean that an automobile dealer would be held to have sold a defective product merely because the most safe equipment is not installed.

*Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321, 329 (S.C. Ct. App. 1995) (quoting *Marchant v. Mitchell Distributing Co.,* 240 S.E.2d 511, 513 (S.C. 1977)). *Accord Hart v. Hytrol Conveyor Co., Inc.,* 823 F. Supp. 87, 93 (N.D.N.Y. 1993) (applying New York law).

FMVSS 209, S4.1(e); 49 CFR §571.209, S4.1(e)]  And, because they have mass, every seatbelt buckle, like every other object on earth, is subject to inertia.  After acknowledging that any buckle will open inertially, Plaintiffs' expert offered nothing beyond his *ipse dixit* that such a condition was "unreasonably dangerous" to someone using a JDC buckle.  He did not demonstrate, nor touch upon, the statistical risk of an "inertial release" occurring to a JDC buckle during a real world accident.  Completely missing from Plaintiff's case is any evidence bearing upon:  (a) the JDC buckle's level of resistance to inertial; or (b) whether the JDC buckle had a sufficient level of resistance to inertia to function during this accident; or (c) the level of resistance to inertia that is appropriate for seatbelt buckles in general; or (d) the typical G forces encountered during a wreck; or (e) the "worst case" acceleration levels that might be encountered during a wreck; or (f) a reasonable margin of safety for a buckle beyond that "worst case" scenario.

With respect to their *prima facie* burden in a design defect case, Plaintiffs may have identified a theoretical "risk," but they provided no evidence by which the jury could quantify or evaluate that risk to reach a reasoned conclusion about whether or not the JDC buckle was capable of dealing with that risk.  Plaintiffs may have fabricated a "risk" called "inertial release," but they utterly failed to show that the risk was a *realistic* "risk" to people who are involved in a 20 G accident.

Plaintiffs failed to present any evidence as to whether the physical forces necessary to inertially unlatch a JDC buckle can occur in any real world accident, the time duration over which those forces would have to exist to cause a buckle to unlatch, or the direction in which such forces must be oriented to cause a JDC buckle to unlatch.  They also failed to discuss each of these critical points either "in general" or in the context of this specific 20 G accident.  Such

proofs are essential to determine whether a product is ". . . unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." *See Harper,* 61 S.W.3d at 124.  Because Plaintiffs failed to address these subjects, Honeywell is entitled to judgment notwithstanding the verdict.

## VI.   PLAINTIFFS ALSO FAILED TO DEMONSTRATE THAT THEIR PROPOSED ALTERNATIVE DESIGNS WERE SAFER THAN THE JDC BUCKLE.

Not only did Plaintiffs fail to prove that the JDC buckle was unreasonably dangerous, they also failed to prove through empirical data or otherwise that their proposed alternative designs were safer than the JDC buckle.  To establish a safer alternative design, ". . . a plaintiff must establish that the alternative design not only would have reduced the risk of harm in the instant case, but also would not 'under other circumstances, impose an equal or greater risk of harm.'"  *DaimlerChrysler Corp. v. Hillhouse,* 161 S.W.3d at 541, 553 (Tex. App.-San Antonio 2004, no pet.).  Plaintiffs' sole evidence on this issue was the unfounded conclusion of their expert who opined that the proposed alternative designs were relatively more resistant to acceleration as compared to the JDC buckle.  But such proof did not establish that the JDC buckle was "defective" or even that it was "less than adequate," because a buckle's resistance to acceleration is both a "dose" *and* "duration" dependent phenomenon.  If the JDC buckle is already capable of resisting foreseeable forces in a wreck, then proof that another buckle is "stronger" proves only that the JDC buckle is "different," but not that it is "defective." Undisputed testimony established that the JDC buckle is capable of resisting 177 G's.  This accident only involved 20 G's (as claimed by Plaintiffs' expert).  A buckle that might resist even higher G forces is entirely superfluous since a resistance level of 177 G's is already *nine times* more than sufficient.  Indeed, Plaintiffs presented no evidence as to the resistance level of any alternative design.

Plaintiffs submitted absolutely no evidence to demonstrate that any real world accident, let alone this accident, can impose anywhere near 177 G's on a JDC buckle for a duration sufficient to cause that buckle to open spontaneously nor how any other design would function. .

Failure of proof is not cured by the mere *ipse dixit* of their expert who claimed that the proffered alternative buckles were "safer." In another safety restraint case, it was held that Syson's "[u]nsupported statements that an alternative design would be safer is no evidence." *Harper,* 61 S.W.3d at 128, 130 n.7 (finding that Syson failed to demonstrate a safer alternative design where he "did no test to see if the Takata webbing or other energy absorbers would prevent drivers from hitting the steering wheel"). See also *Hillhouse,* 161 S.W.3d at 555. (Upholding a "no evidence" challenge to an expert's testimony, where expert's testimony that de-powered airbag would have prevented or lessened plaintiffs injuries was speculative, based on conjecture and failed to rely on any non-speculative tests).

Just as in *Harper,* Syson here again failed to conduct any tests, perform any studies, or analyze any data to demonstrate that conditions capable of opening a JDC buckle occurred during this accident. *See Harper,* 61 S.W.3d at 130. His testimony is without any scientific support, and is nothing more than conclusory assertions about an alternative that was not used in the subject vehicle -- precisely the reason why his testimony was disregarded by the Texas Court of Appeals in *Harper. See Id.* at 128-30 (upholding a "no evidence" challenge to Syson's testimony, where his claim that an alternate seatbelt design was "safer" was based upon assumptions rather than testing). Syson's testimony was clearly insufficient. Accordingly, Honeywell is entitled to judgment notwithstanding the verdict.

## VII. PLAINTIFFS ALSO FAILED TO PRODUCE ANY EVIDENCE ABOUT THE "FEASIBILITY" OR "UTILITY" OF THEIR PROPOSED ALTERNATIVE DESIGNS.

Plaintiffs failed to prove the "feasibility" of their proposed alternative designs. Although

they offered four alternate buckles, each alternative was intended for a different application (use with pretensioners; devices that use a pyrotechnic charge to pull the buckle rearward, removing slack from the seatbelt webbing, but simultaneously subjecting the buckle to significant acceleration forces before an occupant can "load" the webbing to generate the "web tension" which causes standard end-release buckles, such as the JDC, to remain latched under load). Plaintiffs' expert offered no testimony about whether it was necessary, advisable or even physically possible to equip the folding rear seats of the 1996 Chevrolet Tahoe with buckle pretensioners or with the alternative buckles capable of dealing with the forces generated by pretensioners. He offered no testimony concerning the increased costs, maintenance or safety issues associated with those alternative buckles or their *pyrotechnic* pretensioning mechanisms. He didn't even tell the jury whether space was physically available to mount such buckles and their associated hardware in the confines of the Tahoe's folding rear seat. As a result, Plaintiffs utterly failed to meet the "utility" prong of their burden of proof, and Honeywell is entitled to judgment as a matter of law.

This failure of proof was highlighted by the fact that three of the four proposed alternative buckles were the patented, proprietary intellectual property of other suppliers. [5] Federal patent law absolutely precluded Honeywell from manufacturing those three alternatives. See 35 U.S.C.A. § 271. Because Honeywell could not legally manufacture those three buckles, none of them can be considered "feasible" alternative designs for Honeywell use. See *Lewis v. American Cyanmid Co.*, 155 N.J. 544, 715 A.2d 967 (1998) (noting that a plaintiff could not succeed on an alternative design theory that would have required the defendant to violate law). To the extent that the jury's verdict rested upon any one or all of those three proffered alternatives, Honeywell is entitled to judgment

---

[5] The fourth proposed alternative buckle was a patented design owned by Honeywell and the evidence showed that Honeywell had sold that alternative buckle to General Motors for use in other vehicles. However, as the world's largest manufacturer of motor vehicles, General Motors chose instead to purchase JDC buckles for the 1996 Chevrolet Tahoe. As explained below, that choice by GM also precludes liability against Honeywell.

notwithstanding the verdict.  At a minimum, because the introduction of such evidence was clearly prejudicial (by suggesting not one but three alternatives that were legally beyond Honeywell's power to supply), such evidence was manifestly prejudicial, entitling Honeywell to a new trial.

VIII. **BECAUSE HONEYWELL OFFERED ITS "BLOCKING BUCKLE" TO GENERAL MOTORS, HONEYWELL HAS NO LIABILITY. AS A SOPHISTICATED PURCHASER, GENERAL MOTORS CHOSE INSTEAD TO EQUIP THE 1996 CHEVROLET TAHOE WITH JDC BUCKLES.**

As to the fourth variant of a "blocking buckle" (on which Honeywell did hold a patent), Honeywell can have no liability because Honeywell offered that buckle to GM.  GM made the decision to use JDC buckles for the 1996 Tahoe.  When available options are provided to a sophisticated purchaser like General Motors, the duty to exercise reasonable care in selecting from among the available options appropriate to the environment of use lies not with the supplier, but rather with the sophisticated purchaser.  *See Biss v. Tenneco, Inc.,* 64 A.D.2d 204, 409 N.Y.S.2d 874 (1978), lv. den. 46 N.Y.2d 711, 416 N.Y.S.2d 1025 (1979); see also *Fallon v. Clifford B.  Hannay & Son, Inc.,* 153 A.D.2d 95, 550 N.Y.S.2d 135 (1989); *Rainbow v. Albert Elia Bldg.  Co., Inc.,* 79 A.D.2d 287, 436 N.Y.S.2d 480 (1981) *affd* 56 N.Y.2d 550, 449 N.Y.S.2d 967 (1982); *Kirby v. Rouselle Corp.,* 108 Misc.2d 291, 437 N.Y.S.2d 512 (1981).  To hold otherwise casts a component manufacturer in the role of an absolute insurer, answerable to injured parties merely because the sophisticated purchaser for his own reasons, economic or otherwise, elected not to purchase the available option.  *Biss v. Tenneco, Inc.,* 64 A.D.2d at 204.

In *Biss v. Tennaco, 409 N.Y.S.2d 874 (N.Y. App. Div. 1978), app den, 389 N.E.2d 841 (N.Y. 1979),* the court articulated a bright line rule that a supplier is relieved of any legal duty when it provides a sophisticated purchaser with an available option.  The *Biss* court noted that because the alternative design (a rollover protection device) had been offered to the purchaser, the manufacturer had discharged its duty with regard to that safety device.  The Court explained:

Plaintiff's complaint is that the loader had a "design defect" because defendants failed to provide the vehicle with a roll over protective structure. As so stated, the issue, then, is whether the jury should have been permitted to find that the loader was defectively designed because a ROPS was not supplied as standard, rather than optional, equipment.

> *The proof is undisputed that a ROPS was available to Centers when he purchased the loader. . . That being so, defendants had fulfilled their duty to exercise reasonable skill and care in designing the product as a matter of law when they advised the purchaser that an appropriate safety structure for the loader was available.*

*Biss,* 409 N.Y.S.2d at 876-877 (Emphasis added).

The reasoning of *Biss* was cited as persuasive by the United States Court of Appeals for the Fifth Circuit in *Scallan v. Duriron Co., Inc.* 11 F.3d 1249, 1254 (5th Cir. 1994). There, the Court rejected an argument that the manufacturer of a pump was liable for failing to equip a pump with a safety device that the purchaser knowingly rejected.

> It makes no practical sense to impose liability on Duriron for failing to equip this pump with an optional warning device that Allied knowingly rejected. Allied was a world leader in chemical production with personnel dedicated to reviewing equipment and deciding whether it met its specialized needs. *See Taylor v. Paul O. Abbe, Inc.,* 516 F.2d 145, 148 (3d Cir. 1975) (stressing the importance of the purchaser's experience). Allied was in a much better position than Duriron to evaluate the various warning devices Duriron made available on this pump and decide which device would make the pump safest in its plant *See Davis v. Caterpillar Tractor Co.,* 719 P.2d 324, 326-27 (Colo. Ct. App. 1985) (citing *Curtis v. General Motors Corp.,* 649 F.2d 808 (10th Cir. 1981)); *see also Linegar v. Armour of America, Inc.,* 909 F.2d 1150 (8th Cir. 1990). To hold Duriron liable for the absence of a safety device declined by the purchaser "casts the manufacturer ... in the role of insurer answerable to injured parties in any event, because the purchaser of the equipment for his own reasons, economic or otherwise, elects not to purchase available options to ensure safety." *Biss,* 409 N.Y.S.2d at 877; *see also* Michael Hoenig, Products Liability: Substantive, Procedural and Policy Issues 64-65 (1992). The district court correctly rejected Scallan's defective design claim predicated on this theory.

*Scallan,* 11 F.3d at 1254. [6]

---

[6] *Scallan* was again cited with approval by the Fifth Circuit in *McLennan v. American Eurocopter Corp., Inc.* 245 F.3d 403, 430 (5th Cir. 2001) when applying Texas law. The Court noted that "[w]hile *Scallan* was controlled by Louisiana law, the Court's discussion of this principle was not based in Louisiana law, and the Court

In the present case, Honeywell has no liability because it earlier offered its "blocking buckle" to General Motors. Indeed, Honeywell not only offered but actually sold the alternative buckle to GM for use in other vehicles. However, GM, as perhaps the most sophisticated industrial corporation in the world, made the decision to purchase and install JDC buckles in the 1996 Tahoe. Because Honeywell offered its "blocking buckle" to General Motors, that fact alone is sufficient to absolve Honeywell from liability. Honeywell is entitled to judgment as a matter of law.

## IX.    PLAINTIFFS PROVIDED NO EVIDENCE THAT THE INJURIES WOULD HAVE BEEN AVOIDED IF THEIR PROPOSED ALTERNATIVE DESIGNS HAD BEEN ADOPTED BY GENERAL MOTORS.

Plaintiffs also failed to establish that the result would have been any different even if General Motors had chosen to use one of the alternate buckles instead of the JDC buckle. Other than a reference that the accident involved acceleration forces of 20 G's (a force far too low to unlatch a JDC buckle inertially), Plaintiffs failed to establish through testing, empirical data or otherwise that the alternative designs would have prevented the same result. There is no evidence in the record about any one of the alternate buckles' ability to resist inertia. Plaintiffs may have _assumed_ that those buckles are "different" from the JDC buckle, but no plaintiff or juror can be allowed to "assume" how those alternatives might have functioned in this accident.

---

cited authority from other jurisdictions in support of this general principle of products liability." Id. at 430. As the _McLennan_ Court rightly noted, this rule of law is supported by an overwhelming majority of jurisdictions. _See also Austin v. Clark Equipment Co.,_ 48 F.3d 833, 837 (4th Cir. 1995) (it is "axiomatic" that a manufacturer cannot be held liable for damages that could have been prevented by a safety feature when a customer elects to purchase a product without a safety feature); _Owens v. Allis-Chalmers,_ 414 Mich. 413 (1982); _Babin v. Yale Materials Handling Corp.,_ 50 F.3d 5 (Table), 1995 WL 115857, at *3 (4th Cir. 1995) (manufacturer that offered safety reversing device for a truck as an option was not strictly liable under Maryland law because purchaser of the truck was in the "best position to evaluate the need" for the device, and had refused it.); _Villar v. E.W. Bliss Co,_ 350 N.W. 2d 920, 921-22 (Mich. App., 1984) (the applicable statutory requirement that the employer supply a safe workplace indicated that the customer had knowledge of the requirement of safety equipment); _Rainbow v. Albert Elia Building Co,_ 79 A.D.2d 287; 436 N.Y.S.2d 480 (N.Y. App Div, 1978); _Davis v. Caterpillar Tractor Co,_ 719 P.2d 324; (Colo App, 1985); _Noonan v. Texaco,_ 713 P.2d 160, 164 (Wyo. 1986) ("In any event, it is difficult to find any alleged negligence on the part of [the defendant manufacturers] to have been the cause of the injuries and death here when the deceased's employer, Brinkerhoff-Signal, chose not to use such guards on its drilling rig."); _Butler v. Navistar Int'l Transp. Corp.,_ 809 F. Supp. 1202, 1209 (W.D. Va.1991) (footnotes omitted) ("[w]hen a customer exercises an option to purchase a product without a safety feature, it is axiomatic that the manufacturer should not be held liable for damages which that safety feature may have prevented.").

There is no evidence in the record to establishing the levels of acceleration that these alternative buckles can withstand, nor is there evidence establishing that the forces in the accident fell into a range where the JDC buckle would open spontaneously, but the alternatives would remain latched.  Without such evidence, Plaintiffs failed to prove the *effectiveness* of their proposed alternative designs.  Because Plaintiff presented no evidence that the same result would not have occurred had any one or all of the alternative buckles been used, Honeywell is entitled to judgment as a matter of law. *See, e.g., Flock v. Scripto-Tokai Corp.,* 319 F.3d 231, 239-40 (5th Cir. 2003); *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex. 1995); *General Motors Corp. v. Harper,* 61 S.W.3d 118, 130-31 (Tex. App.-Eastland 2001, pet. denied).

## X.   PLAINTIFF'S EXPERT TESTIMONY WAS SPECULATIVE AND SHOULD HAVE BEEN STRICKEN UNDER *DAUBERT*

Federal Rule of Evidence 702 requires that all expert testimony be reliable, based upon sufficient data, and that expert properly apply the underlying data to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579; 113 S. Ct. 2786 (1993), the United States Supreme Court clarified that Rule 702 requires expert testimony be relevant to deciding a fact in issue, i.e., that the expert testimony, and the underlying data upon which the testimony relies, must "fit" the facts of the case.  *Daubert,* 509 U.S. at 591-92; 113 S. Ct. at 2795-96. *See also Guy v. Crown Equipment Co.,* 394 F.3d 320, 325 (5th Cir. 2004) (holding that in considering expert testimony, " . . . the court must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case."); *Cano v. Everest Minerals Corp.,* 362 F. Supp. 2d 814, 840 (W.D. Tex. 2005) (holding that an expert's "generic opinion that ionizing radiation causes cancer is irrelevant because it does not fit the facts of this case," where the expert's affidavit ". . . provides no scientific article citations and no explanation of how he bridges the analytical gap from ionizing radiation in general to conclude

that exposure to uranium ore and its byproducts can cause all of the cancers in this case.").

In this case, Syson's testimony and the underlying data upon which his testimony was based, did not fit the facts of the accident in question. Syson referred only to testing allegedly performed by GM. Over objection, he presented three videotapes but no test reports or other empirical data, nor any Test Incident Reports analyzing the anomalies reflected in the films, thereby exacerbating the prejudicial effect of those films. Syson did not attend any of the tests and was unable to verify any of the parameters of the tests. Notably, he could not even verify that the buckles involved in GM's tests were Honeywell's JDC buckles, lamely asserting that "he assumed that the buckles were JDC's because GM told him they were."

Honeywell's expert, Mr. Davee, testified that GM's tests were *not* performed under conditions similar to those existing at the time of the Frazier accident, nor even with undamaged, production level JDC buckles. One test involved seatbelt webbing with a torn stitch pattern. A second test involved a buckle that was not a Honeywell buckle; while the third test involved a vehicle that had been involved in two previous crash tests, impacting railroad tracks and then a pole before it was finally whacked into a wall in a third test during which a buckle was seen to release. Because none of the tests on which Syson's expert causation testimony relied replicated the circumstances of the Frazier accident or the condition of Lauren Frazier's seatbelt, Syson's testimony did not satisfy the requirement of "fit" under Rule 702, and was wholly irrelevant to the issues involved in this case. His testimony and the GM test films underlying that testimony was also grossly prejudicial to Honeywell. Honeywell's motion to strike Syson's testimony should have been granted. If that testimony is now stricken, Honeywell is entitled to judgment as a matter of law, but at a minimum, to a new trial free of such unscientific nonsense.

## XI.   THE COURT ERRED IN ADMITTING "CRASH AND SLED TEST VIDEOS" WITHOUT PROPER PREDICATE.

Without any predicate other than Mr. Syson's testimony that he had been provided "crash tests by General Motors," the court admitted crash and sled test films without showing of a substantial similarity between those tests and the conditions of this accident. Syson testified that "what we saw in the tests" was "what happened here." Such tests were hearsay as to Honeywell, not authenticated, did not have a showing of substantial similarity and were prejudicial in that they could be misinterpreted since no test data was provided. No test information was given concerning the speeds, belt loads, dummy size, the condition of the belts, or buckles, the style or manufacturer of the buckles, nor whether such buckles were even mounted in a vehicle or seating position similar to the seating position occupied by Lauren Frazier. Indeed, the videos themselves demonstrate the dissimilarity of the seatbelt assemblies. Syson testified that the mounting stalk differentiates whether or not a JDC buckle might open inertially, claiming that the longer front stalk is more resistant to acceleration forces. Yet one of his test films showed a front buckle opening. The tests lacked appropriate foundation, their exhibition to the jury was more prejudicial than probative. Honeywell is entitled to a new trial. *See General Motors v. Gayle*, 951 S.W.2d 469 (Tex. 1997).

## XII. THE COURT'S INSTRUCTIONS TO THE JURY REGARDING PROPORTIONATE RESPONSIBILITY AND ALLOCATION OF FAULT WERE ERRONEOUS. HONEYWELL IS ENTITLED TO A NEW TRIAL.

Section 33.003(a) Texas C.P.R.C. requires juries to determine the "percentage of responsibility" of all persons who, in any way, contribute to causing harm to a claimant. Though requested, the court failed to define percentage of responsibility, but rather orally instructed the jury they were to "apportion damages."

*F.F.P. Operating Partners. Duenez*, ____ S.W. 3d ____, 50 Tex. Sup. Ct. J. 102 (Tex. 2006), makes clear that proportionate responsibility applies <u>to any and all conduct which in any</u>

way contributes to a claimant's harm. The failure to properly instruct the jury became an improper comment of the evidence, and in effect instructed the jury not to consider the totality of the circumstances, but to apportion damages rather than access responsibility.

## XIII. THE COURT IMPROPERLY EXCLUDED EVIDENCE BEARING UPON THE CONDUCT OF NATALIE WHITE, THE INTOXICATED DRIVER WHO CAUSED THE ACCIDENT.

The "Proportionate Responsibility" statutory scheme set forth in Chapter 33 C.P.R.C. specifically requires introduction of evidence of all conduct which may contribute to causing the harm for which a claimant seeks recovery. After mandating jury determination of conduct of claimants, Defendants and settling persons (see 33.003(a)) the statute specifically calls for presentation of evidence of such person's conduct. Here the court agreed that submission of settling persons (Natalie White and GM) was required, but improperly excluded evidence of their conduct. How can a jury determine percentages of responsibility when evidence of improper conduct by settled persons is excluded? The court held that the issue could be submitted, but improperly allowed no evidence to be introduced bearing upon that issue. It was stipulated that Natalie White was underage, intoxicated, and a 100 percent cause of the accident. She was also talking on a cell phone at the time and failed to yield the right of way. The jury should have heard such evidence. We now have the unique circumstance of Natalie White pleading guilty to manslaughter, being sentenced to nine years in the penitentiary, while having a jury finding that she did not cause any injury to Lauren Frazier.

## XIV. THE JURY'S VERDICT THAT THE DRIVER OF THE OTHER VEHICLE WAS NOT AT FAULT WAS CONTRARY TO THE STIPULATION OF PLAINTIFFS THAT SHE CAUSED THE ACCIDENT

It was stipulated that Natalie White, the other driver, was legally intoxicated at the time of the accident, that her vehicle struck the Frazier vehicle, that Plaintiffs had settled with her, and that she was a 100 percent cause of the accident. While there has been a historical dispute

between "cause of injury" and "cause of occurrence" (see Tex. Pattern Jury Charge 71.1), the adoption of percentage of responsibility in Chapter 33 C.P.R.C. makes it clear that a jury must consider all causation evidence. The failure to properly instruct the jury resulted in findings directly contrary to stipulated facts and violated the principles set forth in *F.F.P Operating Partners v. Duenez*, supra.

**XV.    THE COURT'S LIMITATION OF HONEYWELL'S TRIAL TIME TO A TOTAL OF ONLY NINE HOURS FOR BOTH DIRECT AND CROSS EXAMINATION IN A WRONGFUL DEATH CASE INVOLVING SIGNIFICANT ENGINEERING ISSUES WAS AN UNCONSTITUTIONAL PRIOR RESTRAINT, A VIOLATION OF DUE PROCESS VIOLATED THE SEVENTH AMENDMENT, WAS PATENTLY UNFAIR AND MANDATES A NEW TRIAL.**

Although courts have inherent power to manage their dockets by placing reasonable time limits on trials, that power is not unfettered. FED. R. CIV. P. 16(c)(15); FED. R. EVID. 611(a); *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 520 (5th Cir.), *cert. denied*, 513 U.S. 1014, 115 S. Ct. 573, 130 L.Ed.2d 490 (1994). First and most importantly, time limits must be reasonable, not rigid and inflexible. *See Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir. 1984). Second, the court must give some deference to the pre-trial requests of the parties. FED. R. CIV. P. 16(c)(15) (listing discussions about time limits as a proper topic for pretrial conference). Third, the constitutional principles of due process (including the right to avoid non-content based, prior restraint of the opportunity to be heard), and the right to a fair trial must be considered.

The trial time limit established by the court (nine hours per side) was unreasonably restrictive, both on its face and as applied to a case involving complex engineering issues, was manifestly unfair and merits a new trial. The Federal Rules of Civil Procedure permit *seven* hours for a single deposition, yet here the defendant was granted a total of only *nine* hours for its entire trial presentation in a wrongful death case. The restriction was so severe that it resulted in little more than both parties leading witnesses, punctuated by an occasional word of "agreement"

from the witnesses in order to attempt to present complex issues.

The establishment of arbitrary and unreasonably short time limits in advance of hearing any substantive evidence was manifestly unfair and merits a new trial. As with all litigants faced with a taking of property, Honeywell enjoyed due process rights, guaranteed by the United States Constitution. See e.g., *First National Bank of Boston v. Bellotti*, 435 U.S. 765, reh'g. denied, 438 U.S. 907 (1978). See also, *General Motors Leasing Corp. v. United States*, 429 U.S. 338 (1977). These rights guarantee a full opportunity to be heard in a rational, dispassionate forum without unreasonable truncation. In this complex case, resulting in a $24 million verdict, court's ruling severely abridged Honeywell's due process rights. The court's unreasonably abbreviated time limitations amounted to nothing less than a prior restraint on the defendant's opportunity to be heard -- and such prior restraints have been condemned universally. [7] This is especially true where the time restraints were imposed without any consideration for the *substantive content* of the testimony itself (for example, restricting a second witnesses' testimony as cumulative or repetitive of earlier evidence). Although Honeywell did its best to work within the unduly rigid time allotted by the Court, there were numerous evidentiary points that Honeywell would have presented had it been given a fair opportunity to present its case. These include calling Natalie White, the adverse driver, the investigating officer, the EMS personnel who inserted bilateral IV lines into Lauren's arms, Natalie White's boyfriend, to whom she was talking on a cell phone at the time, and detailed testimony concerning Honeywell's relationship to GM, its specifications and requirements, belt testing and the certification, pathologists, treating physicians and Brady

---

[7] "Prior restraints provide public officials with the power to deny the use of a forum in advance of actual expression." *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 999 (7th Cir.2002). While not *per se* unconstitutional, prior restraints are highly disfavored and presumed invalid. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir.2002) (citing *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 29 L.Ed.2d 822 (1971)); *see Freedman v. Maryland*, 380 U.S. 51, 57, 85 S. Ct. 734, 13 L.Ed.2d 649 (1965). For this reason, a prior restraint is presumed to be constitutionally invalid, and the proponent of a prior restraint bears a heavy burden to show the restraint is justified. *Schultz v. City of Cumberland*, 228 F.3d 831, 851 (7th Cir. 2000).

Ross, the driver of the Frazier vehicle.

The time restrictions imposed by this Court were too severe and amounted to prior restraint of Honeywell's due process rights, as well as its right to trial by jury in a fair and effective manner. Honeywell is entitled to a new trial.

## XVI. PLAINTIFF COUNSEL'S OUTRAGEOUS ARGUMENT THAT THE JURY SHOULD "*KICK HONEYWELL'S BUTT*" WAS AN IRRATIONAL APPEAL TO PASSION AND PREJUDICE, PLAIN ERROR AND REQUIRES A NEW TRIAL.

"The very purpose and foundation of every court system is to provide a judiciary where cases can be tried free of bias and prejudice." *Calhoun v. U.S.*, 384 F.2d 180, 185 (5th Cir. 1967). *See also Baker v. Simmons Co.*, 342 F.2d 991, 992 (1st Cir. 1965) (holding that "litigants are entitled to a trial before a tribunal free from bias and prejudice."). To uphold these basic requirements, courts limit the statements and arguments of counsel to evidence admitted and the inferences that may be properly drawn from that evidence. When improper or inflammatory arguments prevent the jury from reaching its decision dispassionately and with due regard for the rights of all concerned, the verdict must be reversed. *See Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233 (5th Cir. 1985); *Rojas v. Richardson*, 703 F.2d 186 (5th Cir. 1983).

The Fifth Circuit has held it improper for a party's counsel to urge a jury to "give the benefit of the doubt to the working man instead of the corporation." *Maldonado v. Missouri Pacific Railway*, 798 F.2d 764, 770 (5th Cir. 1986). That Court also invalidated an attorney's plea that the jury act as the "conscience of the community." *See Westbrook*, 754 F.2d at 1238. Such "us-against-them" statements ". . . have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation." *Id.* "[S]uch argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial." *Id.*

Plaintiff counsel's exhortation at the very end of his rebuttal argument that the jury should "*Go kick Honeywell's butt*" was a plain attempt to prejudice the jury at Honeywell's expense in contravention of well-established rules that prohibit unfair or inflammatory appeals to passion and prejudice in a civil trial. Like the statements invalidated in *Maldonado* and *Westbrook*, counsel's statement attempted to inflame unsophisticated jurors against Honeywell and improperly distracted the jurors from their "sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial."

Although counsel's offensive comment came in the context of his other puerile self-posturing as a "warrior" on the "front lines of justice," those are mere conceits. But an exhortation that the jury should use its verdict to quite literally *assault the defendant* cannot be overlooked or condoned. It was so prejudicial as to rise to the level of plain error requiring a retrial of the case. [8] The remark unduly and unfairly prejudiced Honeywell, as reflected by the jury's grossly excessive verdict. A new trial must be granted.

## XVII. THE $24 MILLION VERDICT, FUELED BY COUNSEL'S IMPROPER ARGUMENT IS GROSSLY EXCESSIVE. A REMITTITUR OR NEW TRIAL SHOULD BE ORDERED.

The jury's $24 million verdict is so grossly excessive as to shock the judicial conscience. While Honeywell does not minimize the nature or gravity of the Fraziers' loss, a review of

---

[8] Notably, the Fifth Circuit also has held that where such statements rise to the level of plain error, they are reversible regardless of whether or not a contemporaneous objection was asserted. *See Rojas*, 703 F.2d at 190 ("Nothing in this rule [requiring objection to preserve appealability] precludes taking notice of plain errors affecting substantial rights although they were not although they were not brought to the attention of the court.") (quoting FED. R. EV. 103(d)). In *Rojas*, the Court remanded for a new trial where the defense counsel referred to the plaintiff as an "illegal alien," a charge not supported by the record, and which the Court held was "highly prejudicial and a blatant appeal to jury bias." *Id.* at 191. *See also Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1424 (5th Cir. 1996) (holding that the Court "should correct a plain forfeited error affecting substantial rights if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."). Similar persuasive authority also can be found in Texas law under which it has been held that statements made at the conclusion of a case can be reversed regardless of whether or not the appellant objected to the statements at trial. *See General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex. 2005) ("A party's personal expression of gratitude to the jury at the close of a case is error that cannot be repaired and therefore need not be objected to.").

comparable verdicts involving the death of a teenage child shows this particular verdict to have been the product of passion and prejudice, exacerbated by counsel's clearly improper argument. A jury's award may be disturbed only if found by the Court to be "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). "A jury's award is disproportionate to the injury sustained if it is so large that it shocks the judicial conscience or it indicates passion, prejudice, corruption, bias, or another improper motive." Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420, 1427 (5th Cir. 1992); *Caldarera*, 705 F.2d at 784.

The Court, when reviewing a jury award for excessiveness, must evaluate the jury award in the context of awards in cases with similar injuries in the relevant jurisdiction to determine the "maximum recovery" allowed. *Salinas v. O'Neill*, 286 F.3d 827, 831 (5th Cir. 2002); *Vogler v. Blackmore*, 352 F.3d 150, 156 (5th Cir. 2003).[9] In order to be a "similar" award, the award must: (1) be of the same category of damages; (2) compensate the plaintiff of the same relationship to the decedent; and (3) apply the same substantive law.[10] *Vogler*, 352 F.3d at 156-59. The *Vogler* case provides the formula for calculating "maximum recovery" and also provides a similar award to a parent for the loss of a child upon which to calculate the "maximum recovery." [11]

---

[9] The "maximum recovery" allowed is calculated as follows (provided the similar award was not itself calculated by using the 50 percent multiplier):

   *Amount of similar award + 50% of similar award = Maximum Recovery*

[10] *See* Exhibit A, Table Summary of Texas Wrongful Death Awards for the Loss of a Child.

[11] The *Vogler* court found that no relevant similar awards <u>for the loss of a child</u> existed upon which to base a "maximum recovery" and upheld an award of 1,300,000 for future mental anguish and loss of companionship. To the contrary, the court found that a relevant similar case existed to establish the "maximum recovery" for the <u>loss of a spouse</u> and the court reduced Vogler's recovery of future pecuniary loss, mental anguish, and loss of companionship of $1,500,000 to $600,000 on the basis of a similar award of $400,000 in *Douglass v. Delta Airlines, Inc.*, 709 F. Supp. 745 (W.D. Tex. 1989).  Vogler also received  $200,000 for his <u>past</u> loss of companionship and mental anguish because of his daughter's death, which were unchallenged.  As a result, the $200,000 past and $1,300,000 future mental anguish and loss of companionship damages are a similar and comparable award by which to calculate the "maximum recovery" available to the Fraziers individually.

Here, the jury awarded the Frazier's $4,000,000 for past loss of companionship and mental anguish and $8,000,000 for future loss of companionship and mental anguish, individually. Applying the *Vogler* "maximum recovery" rule, the Frazier's awards, individually, can be no more than $300,000 for past damages[12] and no more than $1,950,000 for future damages.[13] As a result, the maximum total damages allowed for all parties is $4,500,000.[14] The total twenty-four million dollar award in this case is more than *five times* the maximum recovery allowed under *Vogler*, and as such, it is grossly excessive and "shocks the conscience." As subpart XI, *supra*, demonstrates, Plaintiffs' counsel's inflammatory, prejudicial, and outrageous argument requesting that the jury members become "warriors" and "kick Honeywell's butt" in order to "send a message" clearly resulted in an excessive verdict based on passion, prejudice, bias, or other improper motive. Consequently, this court must reduce the award to the maximum amount the jury could properly have awarded or must grant Defendant Honeywell a new trial.

Respectfully submitted,

Richard W. Crews, Jr.
State Bar No. 05075500
Federal I.D. #2430
Attorney in Charge
Hartline, Dacus, Barger, Dreyer & Kern, LLP
800 North Shoreline, Suite 2000, N. Tower
Corpus Christi, TX 78401
(361) 866-8000
(361) 866-8039 (Fax)
rcrews@hdbdk.com
ATTORNEY FOR DEFENDANT
HONEYWELL INTERNATIONAL, INC.

Of Counsel:
J. Kenneth Wainwright, Jr.
Michigan State Bar No. P25633
Harvey Kruse, P. C.
1050 Wilshire Drive
Troy, Michigan 48084-1526
(248) 649-7800
(248) 649-2316 (fax)

---

[12] $200,000 (similar past damages award in *Vogler*) + $100,000 (Fifty percent multiplier) = $300,000.

[13] $1,300,000 (similar future damages award in *Vogler*) + $650,000 (Fifty percent multiplier) = $1,950,000.

[14] ($300,000 + $1,950,000) = 2,250,000 x 2 (The awards for Wayne Frazier and Tonya Frazier were identical) = $4,500,000.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing have been forwarded to all attorneys of record, on this ___ day of February, 2007, in accordance with the Federal Rules of Civil Procedure.

RICHARD W. CREWS, JR.